IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRIAN SHARKOSKI** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 22-3321** |
| | : | |
| **VISITING NURSE ASSOCIATION OF GREATER PHILADELPHIA** | : | |

**MEMORANDUM**

**MURPHY, J.**                                                                                           September 6, 2024

The Family and Medical Leave Act (FMLA) prohibits an employer from firing an employee because they took protected medical leave. But if an employee who happens to need medical leave is terminated for a different reason, the FMLA does not help.

The Visiting Nurse Association of Greater Philadelphia (VNA) argues this case is a classic example of the latter. On summary judgment, VNA's version of the story is that Mr. Sharkoski was terminated after VNA was acquired by Public Health Management Corporation (PHMC) and then had to eliminate positions. VNA maintains that the decision to terminate Mr. Sharkoski was made before any VNA executives knew he needed to take FMLA leave.

Mr. Sharkoski disagrees, relying on factual disputes about when VNA executives knew he intended to take FMLA leave and when VNA decided to terminate him. According to Mr. Sharkoski, the suggestive timing of his termination combined with VNA's inconsistent description of the circumstances are enough for a jury. We agree with Mr. Sharkoski that there are genuine disputes of material fact that a jury will have to resolve, and therefore deny VNA's motion for summary judgment.

I.      **Factual Background**[1]

Mr. Sharkoski worked as the Chief Information Officer (CIO) at VNA.  DI 30-2 ¶¶ 1-4. VNA is a nonprofit that provides home health and hospice services.  *Id.* ¶ 4.  In December 2021, VNA became a wholly owned subsidiary of Public Health Management Corporation (PHMC), another nonprofit health institution.  DI 27-3 ¶ 5; DI 30-2 ¶ 5; DI 27-9 at 32-33 (ECF); DI 30-1 at 5.

Before being acquired, VNA was in financial distress, and leadership informed Mr. Sharkoski that the financial condition of the company was a central reason for the acquisition.  DI 30-2 ¶ 15-16.  PHMC determined that the financial situation necessitated a reduction in force (RIF).  *Id.* ¶¶ 19.  As of December 2021, Mr. Sharkoski knew that he would not be retained as CIO once the transition was complete because PHMC already had someone in that role.  *Id.* ¶ 28.

Mary Zagajeski, the interim President and Chief Executive Officer (CEO), Brian Harris, the interim Chief Financial Officer (CFO), and Mr. Sharkoski decided to make a pitch to PHMC to retain Mr. Sharkoski in a different role.  DI 30-2 ¶¶ 6-7, 24, 30; DI 27-9 at 8 (ECF).  Mr. Sharkoski understood that Ms. Zagajeski and Mr. Harris were "going to bat" for him during this time.  DI 30-2 ¶ 38; DI 27-9 at 40 (ECF).  On January 4, 2022, Ms. Zagajeski sent Mr. Sharkoski and Mr. Harris job descriptions.  DI 30-2 ¶¶ 33-34; DI 27-12.  On March 1, 2022, Ms. Zagajeski sent a "draft JD for Brian Sharkoski's potential position" to Christina Hayden, the Chief of Staff at PHMC, Donna Bailey, the Chief Integrated Health Services Officer at PHMC, and Mr. Harris.  DI 30-2 ¶¶ 8, 9, 37; DI 27-13; DI 27-7.

---

[1] We draw these factual allegations from (1) VNA's statements of material facts (DI 27-3) undisputed by Mr. Sharkoski (DI 30-2); (2) Mr. Sharkoski's additional facts (DI 30-2) undisputed by VNA (DI 34); (3) exhibits and record items accompanying the parties' briefs.

In "early March," Mr. Sharkoski told Ms. Zagajeski and Mr. Harris he was going to take FMLA leave. DI 27-9 at 28-29, 48 (ECF). Ms. Zagajeski testified that on March 4, 2022, she and Mr. Harris attended a budget meeting with the PHMC Finance Committee and asked whether PHMC would be inclined to create a new position for Plaintiff. DI 30-2 ¶ 40. Ms. Zagajeski testified that PHMC declined to do so because of budgetary constraints. *Id*. ¶ 41. Mr. Sharkoski said he told Ms. Zagajeski and Mr. Harris about his need to take FMLA leave prior to this meeting. DI 27-9 at 28-29, 48 (ECF).

After the budget meeting, Ms. Zagajeski and Mr. Harris met with Mr. Sharkowki to report about the meeting. DI 30-2 ¶ 43; DI 27-9 at 46 (ECF). Mr. Sharkoski testified that Ms. Zagajeski and Mr. Harris reported it was a "bad meeting" and "it wasn't looking good." DI 30-2 ¶ 47; DI 27-9 at 46 (ECF). He understood that there were more budgetary restrictions and cuts than were previously planned and the result would be "more people losing their jobs." DI 30-2 ¶ 47; DI 27-9 at 46 (ECF). He also understood that "it didn't look good" for him specifically, but remained "hopeful" that he would be able to transition to another job. DI 27-9 at 46 (ECF). On March 10, 2022, the PHMC's Senior Controller Amy Hohenstein sent an updated staff roster that included the note "Don't Keep" after the line with Mr. Sharkoski's name and title. DI 30-2 ¶¶ 10, 49; DI 27-7.

Mr. Sharkoski made a formal request for FMLA leave on March 23, 2022. DI 34 ¶ 87. The "Notice of Eligibility & Rights and Responsibilities" document states that Mr. Sharkoski is considered a "key employee." DI 27-14 at 4 (ECF). It further states that VNA has not "determined that restoring [Mr. Sharkoski] to employment at the conclusion of FMLA leave will cause substantial and grievous economic harm to us." DI 34 ¶ 68; DI 27-14 at 4 (ECF).

Mr. Sharkoski started his FMLA leave on Aril 4, 2022.  DI 30-2 ¶ 57.  He testified that he had a conversation in June with Cynthia Brown-Harris, the Director of Human Resources at VNA, in which he stated he was "due back soon" and "was trying to figure out where things are at and where I'm going to report to."  DI 34 ¶¶ 86, 93; DI 27-9 at 55 (ECF).  Mr. Sharkoski then sent an email to Ms. Bailey on June 14, 2022.  DI 34 ¶ 93.  On June 17, 2022, Ms. Bailey told Mr. Sharkoski they terminated his position.  DI 34 ¶ 97.  That call was memorialized in an email, which states, in part: "I just spoke to Brian to let him know that we eliminated his position. He acknowledged that it wasn't unexpected, and he appreciated finding out now rather than going back to then be let go."  DI 27-17; DI 30-2 ¶ 60.

Soon after, Mr. Sharkoski was sent a "Separation, Waiver and Release Agreement."  DI 27-18.  It states that "[a] thorough analysis of the current business climate has been conducted and is resulting in the elimination of the Chief Information Officer position at the Visiting Nurse Association of Philadelphia ("VNA"), which will result in your layoff."  *Id*.  VNA repeated this justification for terminating Mr. Sharkoski in an interrogatory response.  DI 30-4 at 6-7.  During her deposition, Ms. Zagajeski testified that Mr. Sharkoski's performance was also a factor in his termination.  DI 34 ¶ 101; DI 27-6 at 13.

II.     **VNA's motion for summary judgment**

VNA moves for summary judgment on Mr. Sharkoski's FMLA retaliation and interference claims.  DI 27-1.  With respect to his retaliation claim, VNA argues that Mr. Sharkoski cannot show causation because VNA decided to eliminate his position before Mr. Sharkoski requested leave.  *Id*. at 11-15.  Further, VNA argues that Mr. Sharkoski has not met his burden to establish that VNA's legitimate business reason for terminating his employment — namely the company's financial condition, which necessitated an acquisition and resulting RIF — were a pretext for discrimination.  DI 33 at 7-8.  VNA also argues that Mr. Sharkoski's

interference claim should be dismissed because he was granted the full 12 weeks of medical leave, and thus his FMLA benefits were not "actually withheld."  DI 27-1 at 9-11.

Mr. Sharkoski responds that there is a genuine dispute of material fact about whether VNA decided to terminate Mr. Sharkoski before or after he invoked his FMLA rights.  DI 30-1 at 4-5.  Viewing the evidence in the light most favorable to him, Mr. Sharkoski argues that the suggestive timing of his termination in relation to his invocation of FMLA rights, combined with inconsistencies in VNA's description of the events, could allow a reasonable factfinder to conclude VNA's stated reason for termination was pretextual.  DI 30-1 at 8-18.  Mr. Sharkoski further argues that VNA interfered with his FMLA rights because he was not restored to his position following leave.  *Id.* at 19.  Therefore, "since his retaliation claim can withstand summary judgment, the interference claim survives summary judgment as well."  *Id.* at 20.

### III.     Standard of Review

The Federal Rules of Civil Procedure require summary judgment movants to "show[ ] that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 203 (3d Cir. 2022) ("[F]or a factual dispute to be material, its resolution must have the potential to affect the outcome of the suit."). And a "genuine dispute" over a material fact means "the evidence is such that a reasonable jury could return a verdict for" the party not moving for summary judgment. *Anderson*, 477 U.S. at 248.  This evidence can be "direct or circumstantial" and "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1898)).  In deciding whether a genuine dispute of material fact exists, we must view "the evidence in the light most favorable

to the nonmovant." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010); *see Young v. Martin*, 801 F.3d 172, 174 n.2 (3d Cir. 2015). Moreover, because employment discrimination cases center around the question of why an employer took an adverse action against a plaintiff, which is "clearly a factual question," summary judgment is "rarely appropriate in this type of case." *Marzano v. Comput. Sci. Corp.*, 91 F.3d 497, 509-10 (3d Cir. 1996) (quoting *Chipollini v. Spencer Gifts Inc.*, 814 F.2d 893, 899 (3d Cir. 1987)).

IV. <u>Analysis</u>

a. **A jury will determine whether VNA retaliated against Mr. Sharkoski for exercising his FMLA rights.**

Mr. Sharkoski claims that VNA retaliated against him for taking FMLA leave. DI 1. When such claims are based on circumstantial evidence, we apply the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012).[2] Under the *McDonnell Douglas* framework, the plaintiff has the initial burden to establish a prima facie case. *Lichenstein*, 691 F.3d at 302. If the plaintiff can do so, the burden of production shifts back to the defendant to articulate a "legitimate, nondiscriminatory reason" for its decision. *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). If defendant meets this burden, the plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably…disbelieve [defendant's] articulated legitimate reasons." *Id.* (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

To establish a prima facie retaliation claim under the FMLA, Mr. Sharkoski must demonstrate that: (1) [He] invoked [his] right to FMLA-qualifying leave; (2) [he] suffered an

---

[2] Neither party disputes that the *McDonnell Douglas* framework is appropriate for this case. DI 27-1 at 11; DI 30-1 at 4.

6

adverse employment decision, and (3) the adverse action was casually related to [his] invocation of rights. *Lichtenstein*, 691 F.3d at 301-02; *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245 (3d Cir. 2014).

> i. **Mr. Sharkoski can demonstrate causation with evidence of the timing of his termination.**

VNA argues Mr. Sharkoski cannot establish the third prong of a prima facie retaliation case.[3]  DI 27-1 at 12.  In particular, VNA argues there is no causation because VNA decided to eliminate Mr. Sharkoski's position before he requested FMLA leave.  DI 27-1 at 13.  Further, "a plaintiff cannot establish a casual link when the 'decision' to take adverse employment action occurred before plaintiff exercised his or her FMLA rights." *Atchinson v. Sears*, 666 F. Supp. 2d 477, 490 (E.D. Pa. 2009); *see also Burch v. WDAS AM/FM*, 2002 1471703, at *10 (E.D. Pa. June 28, 2002); *Cimino v. Magee-Womens Hospital of UPMC*, 2017 WL 2780586, at *4 (W.D. Pa. June 27, 2017).

We agree that if the undisputed material facts showed that VNA decided to terminate Mr. Sharkoski before they knew he intended to take FMLA leave, he could not establish causation. However, we find a genuine dispute of material fact on this key point.

VNA contends[4] that the decision not to retain Mr. Sharkoski in any capacity was finalized at the March 4, 2022 meeting when PHMC declined to create a new position for Mr.

---

[3] VNA does not challenge that Mr. Sharkoski invoked his right to FMLA leave or that he suffered an adverse employment action.  DI 27-1.  Mr. Sharkoski formally requested FMLA leave and was terminated at some point.  DI 27-17; DI 30-2 ¶ 60.

[4] VNA first argues that the central adverse employment action in this case took place in December 2021 when Mr. Sharkoski was informed he would not be retained as CIO.  DI 27-1 at 12; DI 30-2 ¶ 28.  Any later efforts, VNA argues, were an attempt to create a new position for Mr. Sharkoski — and the failure to create a new position is not an adverse employment action. DI 33 at 6-7.  Mr. Sharkoski counters that "there is a stark difference between eliminating

Sharkoski. DI 30-2 ¶¶ 40-41. This decision was memorialized on March 10, 2022, when PHMC's Senior Controller Amy Hohenstein sent an updated staff roster with the note "Don't Keep" after Mr. Sharkoski's name and title. DI 30-2 ¶¶ 10, 49; DI 27-7. This, VNA notes, occurred before Mr. Sharkoski made a formal request for FMLA leave on March 23, 2022. DI 34 ¶ 87.

Mr. Sharkoski disputes both when he first told his employer he needed to take FMLA leave and when VNA made the decision to terminate him. Mr. Sharkoski testified that he told Ms. Zagajeski and Mr. Harris he needed to take FMLA leave in "early March" before the March

---

Plaintiff's job and terminating him" and there is no dispute that he was "terminated" effective June 22, 2022. DI 30-1 at 4-5.

The issue turns on whether Mr. Sharkoski was "terminated" after December 2021. Termination is a classic adverse employment action. *See Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 288 (3d Cir. 2001). However, the Third Circuit has held that a "subjective expectation that [an employer] would create an entirely new position" for an employee cannot support a prima facie case of retaliation because there is no adverse employment action. *Young v. Temple Univ. Hosp.*, 359 F. App'x 304, 310 (3d Cir. 2009). *See also Yandrisevitz v. H.T. Lyons, Inc*., 2009 WL 2195139, at *10 n.8 (E.D. Pa. July 22, 2009) (finding that the FMLA does not "require that the employer create a new position to accommodate the employee" when plaintiff argued FMLA interference for failure to return her to her previous position when she returned from leave).

It cannot be disputed on this record that Mr. Sharkoski was terminated in June. DI 34 ¶ 97; DI 27-17; DI 27-18; DI 30-2 ¶ 60. Though he understood his role as CIO was being eliminated in December, he continued working at the company and hoped that he would be retained in some capacity. DI 30-2 ¶ 28; DI 27-9 at 46 (ECF). Moreover, he was working with Ms. Zagajeski and Mr. Harris to remain at the company. DI 30-2 ¶¶ 6-7, 8-9, 24, 30, 33-34, 37-38; DI 27-9 at 8, 40 (ECF); DI 27-12; DI 27-13; DI 27-7. Additionally, he was called in June to say that his position had been terminated. DI 34 ¶ 97.

Therefore, the crucial moment for this analysis is when VNA decided Mr. Sharkoski would no longer work at VNA, not when they decided to eliminate his position as CIO. *See also Clark v. Phila. Hous. Auth.*, 701 F. App'x 113, 117 (3d Cir. 2017) (quoting *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)) (defining adverse employment action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision caused a significant change in benefits").

8

4, 2022 meeting.[5]  DI 27-9 at 28-29, 48 (ECF).  Further, he presented evidence that the decision to terminate him was not made at the March 4, 2022 meeting.  Rather, he recalls that when Ms. Zagajeski and Mr. Harris left the budget meeting, they did not tell him he would be terminated.  DI 27-9 at 46 (ECF).  Although he understood things "didn't look good" for him, he remained "hopeful" that he would be able to transition to another job.  *Id*.  Additionally, he testified that he understood at the end of his leave he would be "due back soon" and was trying to figure out where to report.  DI 34 ¶¶ 86, 93; DI 27-9 at 55 (ECF).  Moreover, Mr. Bailey called him on June 17, 2022 to tell him his position was eliminated, which was memorialized in an email.  DI 34 ¶ 97; DI 27-17; DI 30-2 ¶ 60.  And when VNA completed Mr. Sharkoski's FMLA paperwork it indicated VNA had not determined that "restoring [Mr. Sharkoski] to employment at the conclusion of FMLA leave will cause substantial and grievous economic harm to us."  DI 34 ¶ 68; DI 27 at 4 (ECF).  Thus, viewing the evidence "in the light most favorable" to Mr. Sharkoski, "the evidence is such that a reasonable jury" could determine VNA made the decision to terminate Mr. Sharkoski after he requested FMLA leave.  *Young*, 801 F.3d at 174 n.2*; Anderson*, 477 U.S. at 248.

Mr. Sharkoski, however, must do more to demonstrate causation.  The Third Circuit's "case law has focused on two main factors in finding the causal link necessary for retaliation: timing and evidence of ongoing antagonism."  *Abramson v. William Paterson Collect of New*

---

[5] "To invoke rights under the FMLA, employees must provide adequate notice about their need to take leave." *Lichtenstein*, 691 F.3d at 303.  This does not require employees to "provide every detail necessary for the employer to verify if the FMLA leave applies." *Id*.  *See also Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir. 2007) (noting that a "formal written request for anticipated leave" is not required and that "simply verbal notification is sufficient" even if the employee does not specifically mention the FMLA).  Here, however, Mr. Sharkoski testified that he did specifically mention the FMLA in his conversation with Zagajeski and Mr. Harris in early March.  DI 27-9 at 28-29, 48 (ECF).

*Jersey*, 260 F.3d 265, 288 (3d Cir. 2001). "To demonstrate a casual connection, a plaintiff generally must show 'either (1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a casual link." *Budhum v. Reading Hospital and Medical Center*, 765 F.3d 245, 258 (3d Cir. 2014) (quoting *Lauren W. ex. rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)). "Whether a causal link exists 'must be considered with a careful eye to the specific facts and circumstances encountered.'" *Id*. at 258 (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n.5 (3d Cir. 2000)).

Here, Mr. Sharkoski argues there is an "unusually suggestive temporal proximity" between his assertion of FMLA rights and his termination. Mr. Sharkoski testified that after he told Ms. Zagajeski and Mr. Harris he needed to take FMLA leave in "early March," they went to a budget meeting on March 4th and left with news that it "didn't look good" for him. DI 27-9 at 28-29, 46-48 (ECF). Moreover, while Mr. Sharkoski was out on leave, he sent an email to Ms. Bailey on June 14, 2022, and three days later Ms. Bailey told him that he was terminated. DI 34 ¶¶ 93, 97.

Mr. Sharkoski's version of events, which we are obliged to accept, could fairly be viewed as demonstrating an "unusually suggestive temporal proximity." *See Budhum*, 765 F.3d at 258 (when decision to replace an employee occurred before FMLA leave ended, this qualified as "unusually suggestive temporal proximity"); *Lichtenstein*, 691 F.3d at 307 (termination seven days after invoking FMLA right sufficient to show temporal proximity); *Marrin v. Capital Health Systems, Inc.*, 2017 WL 2369910, at *13 (D.N.J. May 31, 2017) (finding suggestive temporal proximity when plaintiff was terminated nine calendar days after her return from FMLA leave); *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (finding evidence of a

temporal connection when employee was terminated the day she was scheduled to return to work)[6]; *Shay v. Pennsylvania Dep't of Transp.*, 2024 WL 3522189, at *7 (E.D. Pa. July 24, 2024) (suspension two days after returning from leave followed by termination a month later satisfies temporal proximity). We therefore find that Mr. Sharkoski has adduced adequate evidence such that a jury could find a prima facie case of retaliation.

### ii. Mr. Sharkoski has provided evidence from which a reasonable juror could infer pretext.

We turn next to whether Mr. Sharkoski can satisfy the third prong of the *McDonnell Douglas* burden-shifting analysis.[7] This requires Mr. Sharkoski to "provide evidence from which a reasonable factfinder could reasonably infer that the employer's proffered justification is merely a pretext" for retaliation. *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013); *Lichtenstein*, 691 F.3d at 309. To survive summary judgment, a plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). Moreover, "'a plaintiff cannot simply show that the employer's decision was wrong or mistaken' to prove pretext; rather, the 'plaintiff must

---

[6] The Third Circuit cited *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) approvingly in *Budhun*. 765 F.3d at 258.

[7] It is clear that VNA can satisfy the second prong of the *McDonnell Douglas* burden-shifting framework with a "legitimate, nondiscriminatory" reason for Mr. Sharkoski's termination. VNA points to the company's financial situation, its subsequent reduction-in-force, and the acquisition of VNA by PHMC, which made Mr. Sharkoski's role duplicative. DI 30-2 ¶ 15-16, 19, 28. *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) ("The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable decision."); *Burton v. Telefax Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (noting that the burden to establish legitimate, nondiscriminatory reasons for an adverse employment action is "relatively light").

demonstrate such weaknesses, implausibilities inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could rationally find them unworthy of credence." *Ross v. Gilhuly*, 755 F.3d 185, 194 n.13 (3d Cir. 2014) (quoting *Brewer v. Quaker State Oil Refin. Corp.*, 72 F.3d 326, 331 (1995)). However, the Third Circuit has acknowledged that the prima facie analysis may overlap with finding pretext. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 286 (3d Cir. 2000) (noting that the "evidence supporting the prima facie case is often helpful in the pretext stage and nothing about the *McDonnell Dougla*s formula requires us to ration the evidence between one stage or the other").

For instance, evidence of unusually suggestive temporal proximity can be used both to establish a prima facie case of retaliation and to rebut VNA's explanation for Mr. Sharkoski's termination. *See Jalil v. Avdel Corp.*, 873 F.2d 701, 709 n.6 (3d Cir. 1989) ("Although [the timing of the discharge] is important in establishing plaintiff's prima facie case, there is nothing preventing it from also being used to rebut defendant's proffered explanation."); *Lichtenstein*, 691 F.3d at 311 (noting that timing can help demonstrate pretext"); *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 639 (3d Cir. 1993) ("The timing of an employee's dismissal may raise an inference that an employer's purported reasons for terminating him were pretextual."); *Sowell v. Kelly Services, Inc.*, 139 F. Supp. 3d 684, 697 (E.D. Pa. 2015) (noting that unusually suggestive temporal proximity can be used to rebut a defendant's explanation). As we have already found, Mr. Sharkoski presented evidence of an unusually suggestive temporal proximity between the invocation of his FMLA rights and his termination. The same evidence, therefore, tends to "rebut defendant's proffered explanation."

Additionally, Mr. Sharkoski argues that evidence of VNA's inconsistent statements about why and when he was terminated cast doubt on its articulated reason for his termination. In particular, Mr. Sharkoski says that although VNA identified the reason for his termination in an interrogatory and in his "Separation, Waiver and Release Agreement" as relating to the "business climate" and elimination of the CIO position, Ms. Zagajeski added a different justification in her deposition. DI 27-18; DI 30-4 at 6-7; DI 34 ¶ 101; DI 27-6 at 13. Specifically, she noted that his performance was also a factor in his termination. DI 34 ¶ 101; DI 27-6 at 13. Further, Mr. Sharkoski notes that there is evidence that VNA inconsistently described when they decided to terminate him. While Ms. Zagajeski said the decision was made at the March 4, 2022 meeting, VNA filled out Mr. Sharkoski's FMLA paperwork after this meeting, indicating that Mr. Sharkoski was a "key employee" and they had not determined that restoring him to employment after leave would cause "substantial and grievous economic harm." DI 30-2 ¶ 41; DI 27-14 at 4 (ECF); DI 34 ¶ 68. Moreover, Ms. Bailey did not call Mr. Sharkoski to tell him that his position had been eliminated until June. DI 34 ¶ 97; DI 27-17; DI 30-2 ¶ 60.

Inconsistencies in a defendant's description of termination can help establish pretext. *See Lichtenstein,* 691 F.3d at 310 (finding support for pretext when supervisor contradicted her own testimony about the timing of her decision to fire the employee at least twice during her deposition); *Abramson*, 260 F.3d at 284 ("Abramson also argues that the ever-changing nature of the proffered reasons [for her termination] can be considered as detracting from their legitimacy. We agree."); *Sowell,* 139 F. Supp. 3d at 697 (finding that plaintiff's "testimony and contemporaneous writings contradict the underlying reasons given for her termination" which supports denial of summary judgment); *Woods v. AstraZeneca Pharms.*, L.P., 659 F. Supp. 3d

13

512, 528 (M.D. Pa. 2023) (inconsistent testimony about the reasons for plaintiff's termination supports finding of pretext).

We agree with Mr. Sharkoski that the inconsistent reasons VNA provided for why and when he was terminated could cause a reasonable juror to doubt VNA's proffered legitimate reason for terminating him. This, combined with the suggestive timing of his termination, is sufficient to withstand summary judgment. *See Lupyan v. Corinthian Colls. Inc.*, 761 F.3d 314, 325 (3d Cir. 2014) (finding evidence from which a jury could conclude find retaliation given proximity of leave to termination and that proffered reason for termination contradicted school policy); *Sowell,* 139 F. Supp. 3d at 697 (finding that contemporaneous writing contradicting defendant's story, combined with suggestive timing, made summary judgment inappropriate).[8]

We therefore find that Mr. Sharkoski has presented enough evidence from which a reasonable factfinder could conclude VNA retaliated against him for taking FMLA leave.

### b. We will allow Mr. Sharkoski's interference claim to proceed at this time.

VNA also argues that we should grant summary judgment on Mr. Skarkoski's interference claim. DI 27-1 at 9-11. Because Mr. Sharkoski was granted the full 12 weeks of medical leave,[9] VNA argues that he cannot show his FMLA benefits were "actually withheld,"

---

[8] We also note that a defendant is precluded from using FMLA leave as even a negative factor in employment decisions. 29 C.F.R. § 825.220; *See also Sowell v. Kelly Services, Inc.*, 139 F. Supp. 3d 684, 697 (E.D. Pa. 2015) ("[A] reasonable factfinder could determine that while Ms. Sowell had some performance or attitude deficiencies, her request for FMLA leave was the final straw that precipitated her firing. This would be sufficient to find FMLA liability."); *Lichenstein*, 691 F.3d at 297 ("While it is undisputed that UPMC terminated Lichtenstein for attendance problems and scheduling difficulties, the parties vigorously dispute the event, or the 'final straw,' that triggered the termination.").

[9] In response to this fact, Mr. Sharkoski states "[i]t is undisputed that Plaintiff believed Defendant approved Plaintiff's FMLA extension request." DI 30-2 ¶ 59.

as is required to state an interference claim.[10]  *Ross*, 755 F.3d at 192; DI 27-1 at 10.  Mr. Shakoski says that he has established the requisite withholding of a benefit because he was not restored to his position following leave.[11]  DI 30-1 at 19.  Mr. Sharkoski admits that his "retaliation and interference claims are based on the same facts."  DI 30-1 at 20.  Nevertheless, he argues that he should be able to assert both a retaliation and interference claim because the underlying facts support both.  *Id*; *see also Erdman v. Nationwide Ins. Co*., 582 F.3d 500, 509 (3d Cir. 2009) ("We therefore hold that firing an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee.").

We are not so sure.  The Third Circuit has also cast doubt on whether duplicative interference and retaliation claims should both proceed.  In *Lichtenstein*, the Third Circuit stated, "[i]t is not clear to us that *Erdman* necessarily guarantees that plaintiffs have an automatic right to claim interference where, as here, the claim is so clearly redundant to the retaliation claim." 691 F.3d at 312 n.25.  While the Third Circuit did not squarely decide this issue in its original opinion, it affirmed the dismissal of the interference claim as redundant after trial.  *Lichtenstein v. Univ. of Pittsburgh Med. Ctr*., 598 F. App'x 109, 113-14 (3d Cir. 2015).

---

[10] "To make a claim of interference under the FMLA, a plaintiff must establish that: (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant or his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA." *Ross*, 755 F.3d at 191-92.  VNA argues that Mr. Sharkoski cannot meet the last element of the test. DI 27-1 at 9-10.

[11] An employee who takes leave is generally entitled to be restored to their position. 29 U.S.C. § 2614(a)(1)(A); *see also Budhun*, 765 F.3d at 256 ("Having invoked the FMLA, Budhum was eligible to avail herself of the right to return to her position at the end of her leave.").

as is required to state an interference claim.[10]  *Ross*, 755 F.3d at 192; DI 27-1 at 10.

as is required to state an interference claim.[10]  *Ross*, 755 F.3d at 192; DI 27-1 at 10.  Mr. Shakoski says that he has established the requisite withholding of a benefit because he was not restored to his position following leave.[11]  DI 30-1 at 19.  Mr. Sharkoski admits that his "retaliation and interference claims are based on the same facts."  DI 30-1 at 20.  Nevertheless, he argues that he should be able to assert both a retaliation and interference claim because the underlying facts support both.  *Id*; *see also Erdman v. Nationwide Ins. Co*., 582 F.3d 500, 509 (3d Cir. 2009) ("We therefore hold that firing an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee.").

We are not so sure.  The Third Circuit has also cast doubt on whether duplicative interference and retaliation claims should both proceed.  In *Lichtenstein*, the Third Circuit stated, "[i]t is not clear to us that *Erdman* necessarily guarantees that plaintiffs have an automatic right to claim interference where, as here, the claim is so clearly redundant to the retaliation claim." 691 F.3d at 312 n.25.  While the Third Circuit did not squarely decide this issue in its original opinion, it affirmed the dismissal of the interference claim as redundant after trial.  *Lichtenstein v. Univ. of Pittsburgh Med. Ctr*., 598 F. App'x 109, 113-14 (3d Cir. 2015).

---

[10] "To make a claim of interference under the FMLA, a plaintiff must establish that: (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant or his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA." *Ross*, 755 F.3d at 191-92.  VNA argues that Mr. Sharkoski cannot meet the last element of the test. DI 27-1 at 9-10.

[11] An employee who takes leave is generally entitled to be restored to their position. 29 U.S.C. § 2614(a)(1)(A); *see also Budhun*, 765 F.3d at 256 ("Having invoked the FMLA, Budhum was eligible to avail herself of the right to return to her position at the end of her leave.").

We are similarly concerned about the redundant nature of Mr. Sharkoski's interference claim. It is also unclear to us why Mr. Sharkoski would want to present duplicative claims at trial. That said, we will not dismiss Mr. Sharkoski's interference claim at this point, but during pretrial planning, we expect to hear from Mr. Sharkoski about why the jury should be burdened with the extra claim.

### V.  Conclusion

For the reasons discussed above, we deny VNA's motion for summary judgment (DI 27). Upon finding good cause, VNA's motion to file two exhibits under seal (DI 26) is granted temporarily. VNA shall file Exhibit 2 and Exhibit 15 under seal and file appropriately redacted versions of these exhibits in 30 days.[12]

---

[12] We remind the parties that this will be an open trial; the courtroom will not be closed and exhibits will not be sealed.